IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 23, 2010

## SCOTT W. GRAMMER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
No. 266358    Jon Kerry Blackwood, Judge

_____

**No. E2010-00073-CCA-R3-PC - Filed June 6, 2011**

_____

The petitioner, Scott W. Grammer, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief from his convictions for three counts of aggravated sexual battery and resulting effective twenty-two-year sentence. On appeal, the petitioner contends that he received the ineffective assistance of counsel. In addition, he argues that the State engaged in egregious, improper, and deceptive practices during the trial; that the post-conviction court should have amended his improperly enhanced sentences; and that the evidence is insufficient to support one of his convictions. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and D. KELLY THOMAS, JR., JJ., joined.

Donna Miller, Chattanooga, Tennessee, for the appellant, Scott W. Grammer.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William H. Cox, III, District Attorney General; and Mary Sullivan Moore and Rachael Winfrey, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

The record reflects that the petitioner was charged with two counts of child rape, a Class A felony, and one count of aggravated sexual battery, a Class B felony, against the

victim, his stepdaughter. This court stated the following facts in its opinion from the petitioner's direct appeal:

> [E.G.][1] testified that she is A.G.'s mother, and A.G. is her daughter from a previous marriage. In 1995, when A.G. was five years old, [E.G.] married the [petitioner]. She and the [petitioner] almost ended their relationship in 1993 because the [petitioner] had told her that he had "a problem with attraction to young girls and he was afraid that he may possibly act that attraction out with [A.G.] . . . ." [E.G.] stated that the [petitioner] used to give A.G. extended massages, and "[t]here were times when the [petitioner] appeared like he didn't want to stop touching [A.G.'s] skin."
>
> [E.G.] testified that in November of 2003, A.G. became depressed and had begun cutting herself with knives. A.G. was hospitalized for depression in late November and released on December 1, 2003. During A.G.'s first night out of the hospital, [E.G.] attended a meeting and was away from the home until around 11:00 p.m. When she returned home, the [petitioner] informed her that A.G. was agitated and needed attention. When [E.G.] spoke with A.G., A.G. stated that she wanted to cut herself and that she did not think she could keep herself safe overnight. [E.G.] testified that she contacted A.G.'s caseworker at the hospital to inquire about checking A.G. back into the hospital. The caseworker indicated that A.G.'s behavior was not atypical because many young people develop close friendships while hospitalized and will "act up" in order to be readmitted. When [E.G.] finished the phone conversation with the caseworker, A.G. told [E.G.] that she wanted [E.G.] to read some of the poetry A.G. had written while in the hospital. The poem read, in part, ". . . you have shown me things/ A child shouldn't see/ Things a child shouldn't know/ Things that make me feel disgusting/ And I want to die!" [E.G.] asked A.G. if someone had touched her inappropriately, and A.G. indicated that the [petitioner] had. [E.G.] testified that she then confronted the [petitioner], that the [petitioner] appeared to go

---

[1] In order to protect the victim's identity, we will refer to the victim's mother by her initials.

into shock, simply repeating "no, no, no" to all of [E.G.]'s inquires on the subject.

[E.G.] stated that she called 911, but the [petitioner] took the phone from her hand and hung it up. [E.G.] and the [petitioner] discussed the situation, and she told the [petitioner] that she was taking A.G. and leaving. According to [E.G.], the [petitioner] asked her not to leave, and she replied that if she were going to stay, the [petitioner] would have to tell her the truth. The [petitioner] took several deep breaths and stated: "I've touched [A.G.] inappropriately." [E.G.] recalled yelling at the [petitioner] and crying, and the [petitioner] was also crying and apologizing profusely. Shortly thereafter, two police officers arrived and separated [E.G.] and the victim from the [petitioner]. [E.G.] visited the [petitioner] while he was incarcerated, and she indicated that during each visit he expressed remorse for what had happened. [E.G.] testified that the [petitioner] had walked around their apartment nude in front of A.G., and, at one point, she found pornographic pictures of children on the [petitioner's] computer.

A.G. testified that, at the time of the trial, she was fourteen years old, and she considered the [petitioner] to be her father. A.G. said that the [petitioner] normally wore boxer shorts or would be naked while they were at home, and the [petitioner] often lay in bed with her completely naked, which made her uncomfortable. A.G. stated that the [petitioner] began sexually abusing her when she was nine years old, and the first sexual abuse occurred in March or April of 2000, while her mother was away at a weekly social group. A.G. was at home with the [petitioner] watching the film Pleasantville, and there was a scene involving female masturbation. A.G. indicated that, at the time, she did not know that the character in the film was masturbating and she had at that time never engaged in masturbation. During this scene, the [petitioner] "French kiss[ed]" her. She said that the [petitioner] then had her take off her clothes, touched her breasts and vagina, and performed oral sex on her. A.G. testified that the [petitioner] "masturbated" her by touching her on the outside of her vagina and by sticking his finger inside of her. He then made her lay down on her back

and inserted his tongue into her vagina. A.G. testified that she thought that what the [petitioner] was doing was appropriate because she loved the [petitioner]. At one point, A.G. asked the [petitioner] if there was anything wrong with it, and he responded that "not everyone thinks this is right." A.G. said she then asked him, "Does [m]ommy think this is al[]right?" He responded, "No, so you shouldn't tell her." A.G. testified she did not ask the [petitioner] any further questions because she trusted him.

. . . .

A.G. testified that another time, . . . the [petitioner] came into A.G.'s room while A.G.'s mother was asleep. A.G. was having trouble with a video game called "Pets," and the [petitioner] determined that a piece of software needed to be downloaded to fix the game. While the software was downloading, the [petitioner] kissed A.G. and had her take off her clothes.

. . . .

A.G. stated that on several occasions the [petitioner] had her lie on top of him. She described one such incident in detail saying:

> [H]e had me lay on top of him with my hind-end like over his face, and he performed oral sex on me and put his tongue and fingers inside of me and had me masturbate him. . . . I remember it was daylight, warm outside, because I remember while this was happening, a lot of times I would look out the window, because I didn't want to pay attention to what was happening.

A.G. testified that in November of 2003, after a fight with her mother, she began thinking about the abuse and decided to start cutting herself to feel better. She indicated that some friends at school were very involved in cutting themselves and told her that it would make her feel much better. On November

-4-

24, 2003, A.G. was admitted to the hospital for the psychological and emotional problems she was having. On December 1, 2003, she was released, and the following day she disclosed the abuse she had suffered. A.G. also recalled the [petitioner] acknowledging "I touched her inappropriately" when A.G.'s mother threatened to leave the [petitioner]if he did not tell her the truth.

A.G. testified that sometimes during the abuse she would ask the [petitioner] to stop, and he would momentarily stop and then commence what he was doing. She said that the abuse finally ceased when she was around eleven years old. She recalled that the [petitioner] never inserted his penis into her.

On cross-examination, A.G. agreed that sometimes she cut herself because she was upset about breaking up with a girlfriend. A.G. also acknowledged that during her initial interview regarding the abuse, she may have said that she could not remember anything specific and that her memory of the incidents was "fuzzy." She testified that as time has passed, she has begun to remember things better.

The [petitioner] testified that he had a good relationship with A.G. However, he felt that the relationship became strained when A.G. began to go through puberty. According to the [petitioner], A.G.'s behavior further deteriorated through 2003, and A.G. began cutting herself in November of 2003 when A.G. broke up with her girlfriend. The [petitioner] said that he and his wife responded by taking A.G. to an inpatient facility, but A.G. was allowed to return home after "contracting" that she would not hurt herself. Shortly thereafter, A.G. woke the [petitioner] and his wife up one night and said that she wanted to cut herself, which they later learned was actually an aborted suicide attempt. A.G. was readmitted into the psychiatric hospital and remained there for several days.

The [petitioner] testified that, upon A.G.'s return home, A.G. informed her mother that the [petitioner] had been touching her inappropriately. The [petitioner] stated that he was first made aware of this accusation while A.G.'s mother was on

the phone with what he believed was the psychiatric hospital. He said that he took the phone and hung it up out of "instinct" and that he did not know that A.G.'s mother was actually on the phone with a 911 operator. The [petitioner] denied ever making the statement "I touched her inappropriately" during the initial confrontation with A.G.'s mother. The [petitioner] stated that a few minutes later the police arrived, and he was told that he had to leave and to contact Detective Akins in the morning. The [petitioner] testified that he never expressed any form of sexual attraction to children.

On cross-examination, the [petitioner] denied walking around the house naked in front of A.G. He stated that [E.G.] had insisted it was fine for him to be naked in front of A.G. when she was young, but he never felt comfortable being nude in her presence and stopped when A.G. was seven or eight years old. The [petitioner] indicated that [E.G.] had testified that the [petitioner] said "I touched her inappropriately" because [E.G.] wanted to facilitate a divorce with him. The [petitioner] stated that he never contacted any girls A.G.'s age on the internet but that he did communicate on the internet with a couple of girls three or four years older than A.G. He was referred to these girls' online diary entries from A.G.'s online diary, and he read them because they were similar in content to A.G.'s and would allow him to better understand how A.G. was thinking.

The [petitioner ]denied ever having pornography on the computer in the home and indicated that he had not fought with [E.G.] about the issue. The [petitioner] testified that A.G. would lie to get out of trouble and that, in spite of the allegations leveled against him, he still loved A.G. He indicated that A.G. had severe problems and that he did not hold her responsible for her words or actions in this case. The [petitioner] denied sexually abusing A.G., and he stated that he did not deny the allegation to the police when they arrived because he was "mortified" and did not know what to say. The [petitioner] indicated that he never apologized to [E.G.] for anything that transpired between the [petitioner] and A.G. He also did not recall A.G. ever writing poetry.

State v. Scott W. Grammer, No. E2005-02604-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 171, at **3-13 (Knoxville, Feb. 26, 2007), perm. to appeal denied, (Tenn. 2007). The jury convicted the appellant of three counts of aggravated sexual battery. Id. at *2.

After our supreme court denied the petitioner's application for permission to appeal his convictions, the petitioner filed a timely petition for post-conviction relief, arguing that he received the ineffective assistance of counsel and that the trial court improperly enhanced his sentences. The post-conviction court appointed counsel, and counsel filed three amended petitions for post-conviction relief, expanding on the petitioner's ineffective assistance of counsel claim. Relevant to this appeal, the petitioner argued that trial counsel was ineffective for (1) failing to object to numerous instances of misconduct and misstatements of the evidence by the prosecutor during her closing argument and while cross-examining the defense expert; (2) failing to object to inadmissible hearsay by E.G., the first police officer who responded to E.G.'s 911 call, and the nurse who performed the victim's physical exam; (3) failing to prepare the petitioner adequately for cross-examination; (4) failing to present evidence favorable to the defense such as testimony from the victim's friends and the petitioner's character witnesses; and (5) failing to cross-examine the victim about her telling a police officer that the abuse occurred for four years when she testified at trial that the abuse occurred for two years.

At the evidentiary hearing, the petitioner's lead trial counsel testified that he began practicing law in 1970, was appointed to represent the petitioner, and "accepted the responsibility for the trial overall." Prior to becoming a defense attorney, he worked as a prosecutor and tried about twenty-five sex abuse cases. However, this may have been his first sex abuse trial as a defense attorney. He and co-counsel met with the petitioner in jail several times. He acknowledged that before trial, the trial court ruled that the defense could not have the victim's psychological records. The defense had wanted to talk with the victim's friends but could not find any of them. Lead counsel said he cross-examined the victim's mother extensively to show "some inconsistency with her and Mr. Grammer's relationship and relationship to the daughter." He said that no pictures of child pornography were on the petitioner's computer and that he did not know why he failed to object when the victim's mother testified pictures were on the computer. The victim was a better witness for the State than lead counsel had expected, and he thought she had been coached. However, he did not remember whether he cross-examined her about any coaching. He said that he was familiar with the fresh complaint doctrine and acknowledged that a police officer, a detective, the victim's mother, and a nurse testified about the victim's statements without any objection from the defense. He explained,

> I think that we got into the point that it was a spontaneous
> statement by [the victim] to her mother, who could testify about

it, and once that was opened, it really didn't make a lot of difference whether other people repeated. Her mother was going to testify to that fact and to the incriminating statement Mr. Grammer made in response to the first accusation.

Lead counsel testified that although the defense expert had not interviewed the victim before trial and was not in the courtroom during the victim's testimony, the expert understood the petitioner's case and "got out everything we had gone over." When asked why he did not object to the prosecutor's "brutal" cross-examination of the expert, lead counsel said, "Some people badger people. My technique is not to do that but to deal with the important, really important issues in a case." He said that the defense "would have loved to have had some character witnesses" and contacted one of the petitioner's friends but that "he was not able to qualify as a legitimate character witness." Lead counsel said he did not remember inconsistencies between the victim's testimony and her statements to employees at the Child Advocacy Center, and he acknowledged that his cross-examination of the victim had been critical to the defense's strategy. Lead counsel talked with the petitioner about how to answer the State's questions on cross-examination.

Lead counsel testified that he had been familiar with the prosecutor in this case and that she was a "competent prosecutor." He said he did not remember the prosecutor's misstating the evidence or giving her personal opinion during closing arguments. When asked why he did not object to the prosecutor's stating during her argument that the petitioner admitted having child pornography on his computer, lead counsel said that "I don't recall it" and that "sometimes you can do as much damage objecting as you can by not objecting. When you do object, it emphasizes things to the jury." Regarding the prosecutor's tactics, he said, "Sometimes her techniques rubbed against the grain of defense attorneys, but she was, she was effective in her own way." When asked if any of the prosecutor's tactics hurt the defense, he said, "No. Sometimes it actually worked to our favor, I think." Lead counsel and co-counsel also represented the petitioner on direct appeal. Lead counsel said that although co-counsel prepared the appeal, lead counsel "looked at the finished product."

On cross-examination, lead counsel testified that he had conducted "[t]housands" of jury trials since becoming licensed to practice law. He received discovery in this case and met with the petitioner several times about discovery and what would happen at trial. He said he did not object to some things that happened during the trial because "there are times it can highlight that rather than just let it go." He said the defense expert did not interview the victim because "the victim wasn't available to us, period." The petitioner was adamant that he was not guilty and rejected an offer from the State to plead guilty to one count of attempted aggravated sexual battery in exchange for an eight-year sentence to be served as eleven months, twenty-nine days in jail and the remainder on community corrections.

-8-

Co-counsel testified that she assisted lead counsel at trial. She had participated in one jury trial and several bench trials prior to the petitioner's trial but had not handled any jury trials on her own. She said the petitioner's trial was her first "major" trial. She and lead counsel attempted to interview the victim's friends, but co-counsel was unsuccessful in locating or speaking with any of them. She also did not talk with the victim's mother or any of the victim's doctors or counselors. She said she did not remember the petitioner's giving her a list of character witnesses. Co-counsel spent several days with the petitioner, preparing him for his direct testimony. The trial court had ruled that the defense could not have the victim's psychological records, and defense counsel did not file an interlocutory appeal to challenge that ruling. Co-counsel did not remember filing a motion to exclude evidence of pornography allegedly on the petitioner's computer. She also did not remember the State's failing to include one of its elected offenses in the bill of particulars.

Co-counsel testified that she prepared the petitioner's direct appeal. She did not remember whether the trial court enhanced the petitioner's sentences within the range, and she did not raise any sentencing issues on appeal. She said she did not know why the victim's psychological records were not included in the direct appeal record.

On cross-examination, co-counsel testified that she located and retained an expert to testify on the petitioner's behalf and was responsible for questioning the expert at trial. She also received discovery and went over it with the petitioner. She said she and lead counsel met with the petitioner in jail, discussed trial strategy with him, and went over "everything" with him in preparation for trial. Lead counsel was supposed to handle objections during the trial, and he made several objections. Co-counsel was responsible for questioning the petitioner on direct examination. She said that she did not know how much time she spent preparing the petitioner for cross-examination but that she was "sure" she talked with him about his cross-examination testimony. She acknowledged that she received a letter from the petitioner after the trial and that he did not mention anything in the letter about having received the ineffective assistance of counsel. She also acknowledged that the jury did not convict the petitioner as charged.

On redirect examination, co-counsel acknowledged that she received a letter from the petitioner before trial and that the letter contained a list of possible character witnesses. She said that she contacted one of the witnesses on the list but that "[he] did not want to be a part of it." She also acknowledged that prior to trial, she received a letter from the petitioner in which he complained about things that had not been done for trial. Co-counsel said the petitioner was intelligent, and she acknowledged he was cooperative. The defense's strategy was to show the petitioner did not commit the crimes. Defense counsel recommended that the petitioner testify so he could explain the victim's allegations and his relationship with her. The defense also had hoped that the defense expert's testimony would cause the jury to

question the victim's reliability. When asked why the defense did not cross-examine the victim about inconsistencies between her statements in the Child Advocacy Center report and her testimony, co-counsel said, "I don't know." She acknowledged that the defense had received the Child Advocacy Center Report for trial.

The petitioner testified that he gave trial counsel a list of character witnesses before trial and that he thought they discussed "Jeff and Amy" on the list. The petitioner also sent a letter to counsel, complaining about problems with his defense, but counsel did not resolve the issues. The petitioner said he was concerned that the victim's psychological records had not been included in "the file" and that the victim may have made exculpatory statements to a counselor. He acknowledged that the victim previously had denied the abuse to her mother, during a family meeting with the victim's psychologist, and when the victim was admitted to Peninsula Village. The petitioner said he asked counsel to interview the victim's friends and call them as witnesses "[t]o show that the relationship between [the victim] and I was normal." However, counsel did not call any of the victim's friends to testify. The victim had told a police officer that the abuse had been occurring for four years, but she said two years at trial, and counsel did not cross-examine the victim about the inconsistency. The victim was very intelligent, and the petitioner did not think counsel was adequately prepared to cross-examine her. The petitioner remembered meeting with counsel only one time for fifteen to twenty minutes to discuss his cross-examination testimony, and he was not prepared for many of the State's questions. He said he never admitted having child pornography on his computer. Counsel failed to raise some issues on appeal that the petitioner thought should have been included.

On cross-examination, the petitioner testified that defense counsel did not call his sisters to testify and that he thought his sisters would have said he and the victim had a normal relationship. He said counsel told him "about some of what would happen" at trial. Counsel did not force him to testify but strongly suggested it. After the trial, the petitioner asked counsel to file a complaint against the prosecutor with the Board of Professional Responsibility. The petitioner said counsel refused and "that led me to believe that they had a reason not to upset the prosecutor."

Amy Hensley testified that she was a registered nurse, that she had known the petitioner since 1990, and that she and her husband "came down" for the petitioner's trial. No one ever contacted her about being a character witness for the petitioner. She said she would have testified for the petitioner that she never saw anything improper between him and the victim. She said, "They were like a normal father-daughter relationship." She also had never seen the victim express any fear of the petitioner or the petitioner exhibit any violence. She said that she did not have children but that she would not have had any concern about the petitioner's being around her nieces and nephews. She said she did not think the

petitioner was capable of the crimes. On cross-examination, Hensley acknowledged that she was not present at the Grammer home when the abuse allegedly occurred.

Lorrie Miller testified that she used to work for the public defender's office, had been practicing criminal defense law for ten years, and had handled sexual abuse cases. She stated that minor inconsistencies in a victim's statement were very important because "it boils down to a lot of times the defendant's word versus the victim's word." She said that it was routine for a defense attorney to try to speak with the victim and the victim's peers, teachers, and counselors. She said that defense counsel also should gather psychological records and that character witnesses should testify "[i]n some circumstances." She explained that fresh complaint testimony was sometimes inadmissible at trial and that she did not think evidence about child pornography was admissible because its probative value often was outweighed by its prejudicial effect. She explained that when preparing a defendant to testify, "you want to go through their direct testimony . . . so that they're not dealing with their nerves." She also stated that "you've got to prepare them for whatever questions you anticipate that the State will ask" and that defense counsel needed to know a defendant's answers in advance. She said that in a "substantial case," such as this one, a defendant could not be prepared for cross-examination in fifteen to twenty minutes. Regarding the victim's testimony about the Pets computer game incident, she said the victim did not testify about the types of touches involved and that the issue should have been raised on appeal. She acknowledged that the defense also should have raised an issue about the fresh complaint doctrine.

On cross-examination, Miller acknowledged that she was not present at trial and that a defense attorney could not force a victim to speak with the attorney. She said she had gone to trial on only four cases, one of which was a sex abuse case, and acknowledged that she had less experience than lead counsel. She also acknowledged that an attorney's failure to file pretrial motions was not dispositive of a case. On redirect examination, Miller acknowledged that she saw egregious errors in this case.

The post-conviction court denied the petition for post-conviction relief. Regarding counsel's failure to object to instances of prosecutorial misconduct, the post-conviction court stated that "while some portions of the argument were outside the Record and were personal observations," the petitioner failed to show he was prejudiced by the prosecutor's actions. As to the petitioner's claim that counsel failed to object to inadmissible hearsay, the court noted that lead counsel believed the testimony about the victim's statements was admissible as fresh complaint and also did not object based upon strategy. In addition, the post-conviction court found that "there existed a sound evidentiary base for the admission of these hearsay statements." As to the petitioner's claim that counsel failed to prepare him adequately for cross-examination, the trial court stated that the petitioner "fails to point out any portion of his cross examination to support this assertion." Regarding counsel's failure

to call the victim's friends and the petitioner's character witnesses to testify, the court noted that defense counsel testified that they were unable to find the victim's friends and that none of the petitioner's friends qualified as character witnesses. The post-conviction court also concluded that testimony such as Amy Hensley's probably would have been inadmissible and would not have affected the outcome of the trial. The petitioner maintains on appeal that he received the ineffective assistance of counsel.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

[b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

### A. Prosecutor's Statements

The petitioner argues that he received the ineffective assistance of counsel because his trial attorneys failed to object to numerous instances of misconduct by one of the prosecutors during her closing argument and while questioning the defense expert. The State contends that the post-conviction court properly found that the petitioner failed to show he was prejudiced by any alleged prosecutorial misconduct. We agree with the State.

Our review of the record shows that many of the petitioner's claims of misconduct have no merit. For example, the petitioner argues that the following statement by the prosecutor was an improper voucher of credibility on the State's witnesses:

> The mother, like her or not, immediately believes her child, so much so that she called 911. Again, man she'd lived with, known since 1980, high school sweethearts, all she'd ever known. Calls 911 right away because she believes her child so much. Consistent with her testimony. Tells Officer Haley the exact same thing. Consistent with her testimony. Talks to Detective Akins four days later. Consistent with her testimony. Exact same, didn't change. Talks to the DA's office. Consistent. Story never changed. Same story.

In our view, the prosecutor's pointing out that E.G.'s story had remained consistent was not a personal voucher for E.G.'s truthfulness. See State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (stating that one of five areas of prosecutorial misconduct includes "expressing the prosecutor's personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant").

On the other hand, some of the prosecutor's statements were improper. For example, during her rebuttal closing argument, the prosecutor stated, "Scott purported, in his direct, how much he loves [A.G.] . . . . I'm not certain of that" and "But how would Scott Grammar

-13-

benefit by lying, which he so obviously did?" See id. (stating that "[i]t is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony"). The prosecutor also incorrectly stated that the petitioner admitted to having pornography on his computer. See id. (stating that a prosecutor cannot intentionally misstate the evidence). However, the trial court instructed the jury, "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). While not condoning certain statements or remarks made by the prosecutor, we agree with the post-conviction court that the petitioner has failed to demonstrate he was prejudiced by them.

## B. Hearsay Testimony

Next, the petitioner claims that his attorneys should have objected to inadmissible hearsay testimony given by E.G.; the first police officer who responded to E.G.'s 911 call; and nurse Kathy Spada, who interviewed the victim and performed the victim's physical examination. We conclude that the petitioner is not entitled to relief.

According to the trial transcript, E.G. testified without objection that on the night she learned of the abuse, the victim was agitated and wanted to cut herself. E.G. telephoned the victim's hospital caseworker, and the caseworker spoke with the victim over the phone. E.G. stated that while the victim was talking with the caseworker, the victim "got more and more agitated" and told the caseworker, "I have to talk to my mom right now." The victim gave the phone to E.G., and E.G. spoke with the caseworker briefly. E.G. hung up the telephone, and the victim gave E.G. a poem that the victim had written in the hospital. After reading the poem, E.G. asked the victim if someone had touched the victim inappropriately, and the victim nodded her head yes. E.G. said that she asked the victim, "Who did this to you?" and that the victim "pointed towards the back of the house where my husband was at that time." E.G. confronted the petitioner and immediately telephoned 911. The first officer who responded to the 911 call was Officer Mark Haley, who testified that the victim claimed the petitioner "touched her breasts, rubbed her vagina, sometime he would orally violate her." The petitioner contends that E.G.'s and Officer Haley's testimony about what the victim told them was inadmissible hearsay.

The victim's nodding her head affirmatively and pointing to the back of the house in response to her mother's questions and her statements to Officer Haley were hearsay. See Tenn. R. Evid. 801. Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. Our supreme court

has held that the fresh complaint doctrine allows a prosecutor to enter into evidence in the State's case-in-chief the fact of a victim's complaint of a sexual offense. State v. Kendricks, 891 S.W.2d 597, 603 (Tenn. 1994). As noted by the petitioner, in State v. Livingston, 907 S.W.2d 392, 394 (Tenn. 1995), the court eliminated the doctrine of fresh complaint when a child is the victim of sexual abuse. However, a "child" for the purposes of the fresh complaint doctrine is less than thirteen years old. See State v. Schaller, 975 S.W.2d 313, 321 (Tenn. Crim. App. 1997). The direct appeal record reflects that the victim was born in October 1990 and that she reported the abuse to her mother and Officer Haley in November 2003. Therefore, the victim would have been thirteen years old, and E.G.'s and Officer Haley's testimony would have been admissible under the fresh complaint doctrine.

The petitioner also complains that counsel failed to object to hearsay testimony given by Kathy Spada, the registered nurse who interviewed the victim and performed the victim's physical examination. The record reflects that during a jury-out hearing, the following exchange occurred regarding Spada's testimony:

> [THE COURT]: [S]he can testify to her general examination.
>
> [The State]: Yes, sir. And I provided opposing counsel with the Children's Advocacy Center medical report and I'm just going to go through what the child said, for purposes of medical diagnosis and treatment, what the findings were, that kind of thing.
>
> THE COURT: Is that clear?
>
> [Lead counsel]: For medical examination?
>
> THE COURT: Medical examination, yes, sir.
>
> [The State]: And recommendations for treatment?
>
> [Lead counsel]: I'm still objecting to a nurse recommending treatments, Your Honor.
>
> [The State]: Your Honor, she's not just a nurse, she is the medical person that does --
>
> THE COURT: What were your recommendations?

[Spada]: For counseling on a long-term basis.

THE COURT: All right. If that's what she's going to say, that will be fine.

Spada testified that she asked the victim about the abuse in order to "know how to direct my exam, in terms of what I need to look at, what I need to focus on, what cultures I need to do, if she is high risk for any other sexually-transmitted diseases." Spada said the victim told her that "her stepfather had put his mouth on her privates and that he'd also put his fingers inside of her and that he scared her." Spada also stated that the victim claimed the abuse had not occurred "[in] a long time. It had been like well after a week or 72-hour period." Spada did not make any other statements regarding what the victim told her. Spada said that the victim's exam was consistent with the victim's history of digital penetration and cunnilingus and that she recommended counseling for the victim.

Tennessee Rule of Evidence 803(4) provides that "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment" are not excluded by the hearsay rule. Initially, we note that Spada's testimony concerning what the victim told her was extremely limited. In any event, we believe the victim's statements to Spada were made for the purpose of medical diagnosis and treatment.

The petitioner argues that the victim's telling Spada that he "scared her," was not permissible under Rule 803(4), Tennessee Rules of Evidence, and that the statement was extremely prejudicial because it reinforced the victim's credibility. We disagree. The record reflects that lead counsel objected to Spada giving any testimony regarding recommended treatment. However, the trial court ruled Spada could testify that she recommended long-term counseling for the victim. Therefore, in our view, the victim's fear of the petitioner could be construed as falling within the purview of the hearsay exception. In any event, Spada's brief statement that the petitioner scared the victim would have been, at most, harmless error. See Tenn. R. App. P. 36(a).

Given that the all of the witnesses' testimony was admissible, counsel did not render deficient performance by failing to object. The petitioner is not entitled to relief.

C. Petitioner's Cross-examination

The petitioner argues that trial counsel failed to prepare him adequately for cross-examination. However, as noted by the post-conviction court, the petitioner has failed to

-16-

point out any portion of his cross-examination testimony for which he was unprepared. He also has failed to explain what more counsel should have done to prepare him for the State's questions. Therefore, he has failed to show that counsel rendered deficient performance or that he was prejudiced by any deficiency.

## D. Defense Evidence

The petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to have the victim's friends or the petitioner's character witnesses testify. The victim's friends did not testify at the evidentiary hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As to the petitioner's character witnesses, defense counsel testified that they could not find any suitable witnesses to testify on the petitioner's behalf, and the post-conviction court obviously accredited counsel's testimony. In any event, Amy Hensley testified at the hearing that the petitioner and the victim appeared to have a normal father/daughter relationship. However, she also acknowledged that she was not present when the abused allegedly occurred, and the post-conviction court concluded that such testimony would not have made a difference in the outcome of the trial. We agree. Therefore, the petitioner is not entitled to relief.

We note that within this argument, the petitioner notes that he testified at the evidentiary hearing that he provided defense counsel with the victim's online computer diary in which she referred to her mother and the petitioner as "her rocks" and said she did not know what she would do without them. To the extent that the petitioner is raising this as an ineffective assistance of counsel claim, the post-conviction court did not address it in its order denying relief. Regardless, the diary is not in the post-conviction record. Moreover, our review of the trial transcript shows that lead counsel cross-examined the victim about the diary, and she acknowledged saying in the diary, "I seriously don't know what I'd do without [the petitioner] and Mom." Therefore, the petitioner has failed to show that counsel rendered deficient performance or that the petitioner's case was prejudiced.

## E. Victim's Cross-examination

The petitioner argues that counsel should have cross-examined the victim about an inconsistency in her testimony. Specifically, he contends that the victim testified at trial that the abuse occurred for two years, but Officer Haley testified in a jury-out hearing that the victim told him the abuse occurred for four years. The post-conviction court did not address this argument. Nevertheless, we can conclude that the petitioner is not entitled to relief. The purported jury-out hearing is not in the direct appeal or post-conviction records. See Tenn. R. App. P. 24(a). Moreover, according to Officer's Haley's trial testimony, the victim told him the abuse "had been going on for a number of years," which would not be inconsistent

with the victim's testifying that the abuse occurred for two years. Finally, our review of the victim's testimony shows that lead counsel cross-examined her extensively concerning her mental state, the online diary in which she never alleged any sexual abuse, and her motives for claiming the petitioner abused her. The petitioner has failed to show he received the ineffective assistance of counsel.

In addition to the petitioner's ineffective assistance of counsel claim, the petitioner raises several other issues. First, he contends that the post-conviction court should have determined that he was entitled to relief because the prosecutor engaged in "egregious, improper, and deceptive" practices during the trial. However, outside of an ineffective assistance of counsel claim, this issue has been waived because it could have been raised on direct appeal. See Tenn. Code Ann. § 40-30-110(f). Second, the petitioner contends that the post-conviction court should have addressed his claim regarding the trial court's enhancing his sentences within the range in violation of Blakely v. Washington, 542 U.S. 296 (2004). However, this claim also should have been raised on direct appeal. See Roosevelt Morris v. State, No. W2008-01449-CCA-R3-PC, 2010 Tenn. Crim. App. LEXIS 852, at *65 (Jackson, Oct. 11, 2010), perm. to appeal denied, (Tenn. 2011). Finally, the petitioner argues that this court should reverse his aggravated sexual battery conviction for the Pets computer game incident because the evidence is insufficient to support that conviction. However, the issue is waived because it was previously determined by this court on direct appeal. See Grammer, No. E2005-02604-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 171, at *40. In any event, "post-conviction proceedings may not be employed to question or review or test the sufficiency of the evidence at the original trial." Myers v. State, 462 S.W.2d 265, 267 (Tenn. Crim. App. 1970).

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE